IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE AMERICAN CENTER FOR<br>  CIVIL JUSTICE,<br>1331 55th Street<br>Brooklyn, NY  11219<br>                  **Plaintiff,**<br><br>v.<br><br>**JOSHUA M. AMBUSH, Esq.,**<br>3205 Nerak Road<br>Pikesville, MD  21208<br>                  **Defendant.** | **Case No. 1:09-cv-00233 (PLF)**<br><br>**ELECTRONICALLY FILED** |

**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT, PERMANENT INJUNCTION AND DAMAGES**

1.  In this case, a non-profit organization dedicated to recompense for victims of

    terrorism seeks protection from a lawyer, Joshua M. Ambush, who, after being paid

    in full for his work, has sought from this non-profit an additional and extravagant fee

    to which he is not entitled.  In attempting to secure this fee, Mr. Ambush engaged and

    continues to engage in a pattern of behavior that is harmful to the organization and

    that interferes with the organization's ability to properly perform its duties.  The

    organization seeks a declaration that Mr. Ambush is not entitled to additional

    compensation and has breached his fiduciary duties as an agent, entitling the

    organization to damages, injunctive relief, and attorney's fees and costs for this

    action.

## PARTIES

2. Plaintiff, The American Center for Civil Justice (the "Center"), is a 501(c)(3) non-profit victims' rights advocacy organization, organized under the laws of the State of New York, with its principal place of business at 1331 55th Street, Brooklyn, New York. The Center is not a law firm and provides no direct legal services to any person.

3. Defendant, Joshua M. Ambush, Esq., is an attorney and member of the Maryland and District of Columbia bars whose office is located at 1726 Reisterstown Road, Suite 206, in Baltimore, Maryland.

## JURISDICTION

4. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, and the parties are citizens of different states.

5. The relief requested is authorized by 28 U.S.C. § 2201, providing for declaratory judgment, and District of Columbia common law.

6. Venue lies in this district pursuant to 28 U.S.C § 1391(a)(2) because a substantial part of the events giving rise to the claim occurred here.

## STATEMENT OF FACTS

7. The Center was established in 1996 (under its original name of the Raoul Wallenberg Center for Civil Justice) to address the civil rights of United States citizens who have become victims of state-sponsored terrorism. On the premise that lawsuits are an effective deterrent to international terrorists and their financial backers, the Center has successfully funded litigation that has resulted in the seizure of assets for and on

behalf of victims of terrorism and is one of the original proponents of the concept of civil action against terrorist states. Dr. Michael Engelberg has served on the Board of Directors of the Center since its inception and is the current president of the Center. Rabbi Eli Perr has also served on the Board of the Center since its inception.

8.  To accomplish its mission, the Center enters into written agreements with victims of terrorism or the estate representatives of murdered victims (collectively, "claimants"). Under the terms of these Claimant & Center Agreements, the Center advances funds for litigation and retains law firms and individual lawyers to prosecute the claims on behalf of victims of terrorism. In most instances, the Center retains and supervises the efforts of counsel under a power of attorney granted by the plaintiffs to a representative of the Center and advances the money for expenses and experts as needed. The Center typically retains a number of expert investigators to establish the factual link between the terrorist act and the sponsoring states. In a recent case, for example, the Center hired the law firm of Piper Rudnick LLP to represent the relatives of 17 U.S. airmen murdered in the 1996 Khobar Towers bombing in Saudi Arabia, resulting in a judgment in excess of $250 million. The Center also hired Piper Rudnick in the case of Richard L. Stethem, a Navy SEAL who was murdered during a 1985 hijacking, resulting in a judgment of $321,579,737.66 plus interest against the Islamic Republic of Iran. The Center retained the law firm of Jackson & Campbell to assist with the case of Robin L. Higgins, head of the UN Peacekeeping Force, who was abducted, tortured and executed by an Islamic terrorist, resulting in a judgment of $355,431,937.00 plus interest against The Islamic Republic of Iran. In each case, there was an express agreement between Dr. Engelberg, as attorney-in-fact

for the respective claimants, and the law firm regarding the terms on which the legal fees would be paid. The fee arrangements varied, including in some cases straight contingency arrangements and hybrids of hourly and contingent arrangements. In each case, the terms of compensation were agreed to in writing at the inception of the arrangement, and the terms were specific.

9. The Claimant and Center Agreements provide that the Center will "undertake to be responsible for" the "investigation, expenses, costs, and disbursements" and to "secure counsel" to commence litigation against the governments that conspired with the perpetrators of terrorist acts, "subject to its sole discretion in determining the need for, and the amount of, any specific item of expense." In exchange, in "consideration of the ongoing efforts and services of the Center to assist other victims of oppression and to deter further acts of terrorism, and in order to promote the Center's ability to carry out its goals and purposes," each claimant "pledge[s] to pay the Center 20% of the net proceeds" of any recovery and to reimburse the Center's legal fees and expenditures. The Center and Claimant Agreements emphasize, however, that "*the total in the aggregate, including legal fees, expenditures, and pledges, is **not** to exceed 20% of Claimant's recovery.*"

10. Under the Center and Claimant Agreements, the Center assumes all of the risk of non-recovery. In several cases, including several against Iran, the litigation the Center has financed has a resulted in a judgment in favor of the claimants, but no recovery has yet been possible. The claimants in those cases have not been required to pay even a penny to the Center.

11. The Center's record of success in obtaining judgments on behalf of victims of state-sponsored terrorism and the estates of those victims is critical to its ability to further its mission and enter into new agreements for similar litigation on behalf of terrorism victims. Equally critical to the Center's ability to establish these agreements with claimants is the assurance the Center gives that payment of legal fees, expenses, and pledges will not exceed 20% of the claimants' recovery, enabling the claimant to retain 80% of any recovery.

12. The Center actively advocated for legislation to amend the Foreign Sovereign Immunities Act ("FSIA") to confer the jurisdiction of United States Court and impose liability on foreign sovereigns that sponsor terrorist acts. The state-sponsored terrorism exception to the FSIA was enacted in 1996. In 2008, the FSIA was further amended by the Flatow Amendment to strengthen the right of individuals to bring a private cause of action against state sponsors of terrorism and the ability of litigants to attach and execute against the assets of those governments.

13. On information and belief, interest by law firms in representing victims of terrorism has risen since the enactment of the Flatow Amendment. The Center's assurance that any fees or payments associated with obtaining a recovery on behalf of claimants will not exceed 20% of any recovery has therefore become even more important to the Center's ability to enter into agreements with claimants, as most law firms taking such cases on a contingency basis require a larger share of any recovery. In addition, law firms routinely require a retainer fee that many of the individual claimants cannot pay in advance. Because the Center is able to pay the attorneys it secures on behalf of claimants at an hourly rate or under a hybrid hourly/contingency fee arrangement, it is

better able to keep legal fees to under 20% of any recovery and can satisfy any retainer requirement. These arrangements would not otherwise be available to claimants who lack the assets to fund litigation directly.

14. After the enactment of the 1996 amendment to the FSIA, the Center actively worked to identify potential cases that met the Center's goals. Rabbi Perr and Dr. Engelberg conceived of bringing litigation against the state sponsors of the 1972 Lod Airport Massacre and the 1972 Munich massacre on behalf of the terrorism victims as a result of their consultations with Mr. Vaughn Forrest and Yossef Bodansky, the director and assistant director and researcher of the Congressional Task Force on Counterterrorism and Unconventional Warfare, in 1997 – 1998. The Lod Massacre took place in Israel on May 30, 1972. In that attack, Japanese Red Army terrorists supported by the Libyan government opened heavy fire on a group of more than 250 Puerto Rican Americans on a pilgrimage trip to Israel. Twenty-four people were killed and 78 were wounded in the massacre.

15. In 1998, Rabbi Perr contacted David Halevy, a journalist who reported on the Lod Massacre, and other investigators and intelligence agents to provide evidence that Syria and Libya were responsible and liable for these attacks. Establishing and documenting the ties between sponsoring governments and the individuals who carry out acts of terrorism is an arduous and time-consuming process. Rabbi Perr personally worked with Mr. Halevy and others from approximately 1998 through early 2002 to gather documents, military trial transcripts, and general data and intelligence about terror activities, including information related to the role of the Japanese Red Army Faction in service of the Popular Front for the Liberation of

Palestine (" PFLP") under the command of Dr. George Habash, the direct

involvement of terrorist Kozo Okamoto in the Lod Massacre, and the Red Army

Faction terror operations and its intimate relationship with the PFLP. Rabbi Perr and

Mr. Halevy provided the Center with thousands of pages of printed material and

documents supporting a claim against Libya for its role in supporting the groups

responsible for the Lod Massacre.

16. Rabbi Perr has known Defendant since his childhood. Rabbi Perr extended his

guidance and assistance to Defendant throughout the years and gave Defendant his

first legal experience and earning opportunity at the Center, after Defendant passed

the Bar in 2000. Since that time, the Center has had an ongoing relationship with

Defendant on a professional basis. Dr. Engelberg and occasionally Rabbi Perr

directed and assisted Defendant and even paid other attorneys to assist Defendant in

carrying out his assignments. One of these assignments was the Lod Massacre case.

In 2001, Rabbi Perr provided Defendant with equipment and initial rent to open his

own law practice in Baltimore, MD, while at the same time he continued to perform

legal work for the Center.

17. From 2000 until the onset of the dispute at issue in this case, the Center has retained

Defendant to perform a sundry mix of legal and quasi-legal services on behalf of the

Center in sponsored lawsuits. Generally, his role has been defined by his skill set and

primarily has involved the performance of legal research, drafting and filing

complaints (with the assistance of either other counsel or the Center), and supporting

the efforts of counsel brought in by the Center to take the lead in prosecuting the

cases. In the case underlying this dispute and in other cases, the Center has

compensated Defendant for his work on an hourly basis, based on invoices that he has submitted itemizing his activities. Upon information and belief, the hourly rate paid to Defendant is the rate that Defendant has earned in the past in working for other clients unrelated to the Center. In none of its cases has Dr. Engelberg as attorney-in-fact or the Center entered into a binding agreement with Defendant for the payment of a share of the recovery. Instead, the Center has agreed to consider a bonus payment in the event of a substantial recovery, with the decision to pay a bonus and the amount thereof subject to the Center's sole discretion.

18. In 2001, the Center engaged Defendant to help pursue litigation on behalf of victims of the Lod Airport Massacre. At the time the Center engaged Defendant in this effort, no specific claimants had yet been identified, nor had contact been made with the claimants by the Center or by Defendant. The Center regarded Defendant as acting as its attorney and understood that Defendant regarded himself as the Center's attorney in this matter. At Dr. Engelberg's instruction, Defendant was retained to prepare and gather information on the Lod Massacre in anticipation of bringing suit on behalf of victims. In March, April, and June 2001, the Center made four payments totaling in excess of $28,000 for work performed by Defendant on behalf of the Center and at the Center's direction, primarily in connection with preparing the Lod Massacre litigation

19. In June 2001, the Center tasked Defendant with traveling to Puerto Rico to negotiate agreements between the Center and Puerto Rican victims of the Lod Massacre. It turned out that Defendant's distant cousin, Leopold Garcia, was the retired fire

department chief of San Juan, Puerto Rico and was able to assist the Center.   The Center paid Mr. Garcia $1,500 for locating the Franqui Claimants.

20. On June 12, 2001, Defendant, acting as attorney and agent for the Center, met in Puerto Rico with potential claimants in the Lod Airport massacre, including relatives and estate representatives of deceased victims, as well as victims who sustained injuries in the attack.  Acting as attorney and agent for the Center, Defendant signed with each claimant a Claimant and Center Agreement (the "Claimant Agreement"). In total, five Claimant Agreements were signed by representatives of estates seeking wrongful death damages, and five more were signed by victims seeking compensation for physical injuries they suffered in the Lod Airport attacks.

21. The Claimant Agreements contain the terms described above for the Center's standard Claimant and Center Agreements.  The Claimant Agreements also provide that, in the event a claimant fails to cooperate through and with the attorney recommended by the Center, the Claimant will reimburse and compensate the Center for its expenses and costs prior to the termination of the agreement.

22. At the same time that he executed the Claimant Agreement on behalf of the Center, Defendant served as a witness for powers of attorney executed by the claimants authorizing Dr. Engelberg, then executive vice-president of the Center, to act as their attorney-in-fact in connection with potential claims on their behalf.  Ultimately, the Center agreed to prosecute claims on behalf of the estates of five individuals killed and five individuals injured in the Lod Airport Massacre.

23. At Dr. Engelberg's direction, Defendant prepared a draft complaint relating to the Lod Massacre.  The Center then consulted another law firm to review the complaint

and further investigate the claims; this firm ultimately decided not to undertake the lawsuit. Just prior to the expiration of the statute of limitations, at the Center's direction and on Dr. Engelberg's instruction, on April 21, 2006, Defendant filed the complaint in the action, styled *Franqui v. Syria*, No. 1:06-cv-00374 (RBW), in the United States District Court for the District of Columbia (the "*Franqui* Case"). On March 28, 2008, in order to take advantage of the newly enacted Flatow Amendment, Defendant filed an amended complaint.

24. In the summer of 2008, concerned by the increasing complexity of the motions and legal issues, Defendant advised the Center that it would be necessary to engage experienced litigation counsel to take over the pending motions practice and prosecute the claims thereafter. At Defendant's suggestion, Dr. Engelberg as attorney-in-fact engaged Washington, D.C. attorney Paul Gaston, who agreed to assume responsibility for prosecuting the case, with assistance from Defendant. Mr. Gaston had been performing legal services in connection with other cases supported by the Center. For each matter on which Dr. Engelberg has engaged Mr. Gaston and approved by the Center, the compensation terms—whether a straight hourly rate or a discounted hourly rate plus a contingent fee with a cap—were confirmed in writing.

25. In an e-mail exchange on June 5, 2008, Dr. Engelberg and Mr. Gaston confirmed the compensation terms for Mr. Gaston's representation of the *Franqui* plaintiffs. Mr. Gaston agreed to accept a discounted hourly rate for his work, with an additional contingent payment of five percent of any recovery by the *Franqui* plaintiffs, up to a maximum of $250,000, to be paid by the Center from its share.

26. On June 26, 2008, Mr. Gaston, together with Defendant as co-counsel, filed an opposition to a motion to dismiss filed by Libya. From this point on, opposing parties and others involved in the matter, including Dr. Engelberg and the Center, began to deal directly with Mr. Gaston as the primary counsel on the *Franqui* Case.

27. Since July 3, 2008, Mr. Gaston has submitted, and the Center has paid, invoices based on his discounted hourly rate for his work on the *Franqui* Case. Mr. Gaston submitted his second bill on February 3, 2009, and the Center has paid to date.

28. Defendant likewise has been submitting invoices regularly to the Center for his work on the *Franqui* Case. As recently as November 6, 2008, Defendant requested that the Center advance to him $10,000 in fees, which the Center did. Yet, as detailed below, by the end of that very month, Defendant had taken steps to undermine the Center and act completely independently of the Center. Defendant has not repaid the Center for this advance.

29. On August 14, 2008, while the motion to dismiss was pending, Libya entered into an agreement (the "Claims Settlement Agreement") whereby it would establish a fund in the amount of $ 1.8 billion (the "Fund"), to be administered by the United States Department of State, to compensate victims of terrorism sponsored by Libya. The procedures for filing wrongful death claims were set forth in a State Department letter dated November 26, 2008. The five *Franqui* wrongful death claimants would be entitled to approximately $10,000,000 each from the Fund, provided that the necessary documentation was submitted prior to a certain deadline. Additional sums of approximately $3,000,000 each are being made available from the Fund to compensate the personal injury claimants.

30. Shortly after learning of the claimants' ability to recover from the Fund, Defendant stopped communicating with the Center and Dr. Engelberg. Phone calls were unreturned and e-mails were for the most part unanswered.

31. At about the same time, Defendant, recognizing the size of the recovery to be received from the *Franqui* Case, began demanding extravagant additional compensation from the Center for his work, although the parties had never entered into an agreement that he would receive a specific share of any recovery. This was the first time since the inception of the *Franqui* case that Defendant had asked that the Center pay him an amount in addition to his hourly rate. Rabbi Perr told Defendant that he would consider a bonus payment.

32. Concerned about Defendant's venal motives and his ability to file the claims correctly and in a timely manner, the Center, on its own behalf, and Dr. Engelberg, as attorney-in-fact for the *Franqui* plaintiffs, sent notice to Defendant on December 10, 2008, that he was no longer authorized to communicate with the State Department or to represent the claimants in applying for their share of the recovery fund. The notice reminded Defendant that Dr. Engelberg as attorney-in-fact had entered into an agreement with Mr. Gaston to represent the claimants with Defendant's knowledge and asked Defendant to forward to Mr. Gaston all of the information required for a timely response to the State Department's November 26, 2008, letter. Dr. Engelberg instructed Defendant to have the funds advanced by the Center to pay for filing the applications deposited in an escrow account controlled by Mr. Gaston, the lead attorney in the action who also owed a duty to the claimants to safeguard their

property. As Dr. Engelberg was the attorney-in-fact for the claimants, Defendant had an obligation to follow his instruction in that regard. He did not.

33. Mr. Gaston emailed Defendant the next day requesting that he turn over all of the required documents.

34. Not having received a response, the Center, on its own behalf, and Dr. Engelberg, on behalf of the *Franqui* plaintiffs, reiterated its instructions in a second letter, dated December 15, 2008. That letter, from Dr. Engelberg, detailed the documentary proof required to file the wrongful death claims with the State Department. It also reminded Defendant that he was legally and ethically obligated to turn over the claimants' files. Dr. Engelberg assured Defendant that he would be paid at his usual rate for his prior work and for the work associated with gathering the documents. Defendant continued to disregard Dr. Engelberg's instruction, despite the fact that Dr. Engelberg was attorney-in-fact for the claimants.

35. On December 16, 2008, Dr. Engelberg flew to Puerto Rico to retain local counsel to assist with the process of gathering the paperwork necessary to satisfy the State Department's requirements and to ensure that the decedents' estates were properly established.

36. Rather than turn over the documentation and allow Mr. Gaston to complete the representation as directed, Defendant, in breach of his fiduciary and ethical duties, improperly induced each of the *Franqui* wrongful death claimants and four of the personal injury claimants to revoke the powers of attorney that they had granted to Dr. Engelberg more than seven years earlier and that he had negotiated with the *Franqui* claimants as the Center's attorney and agent. The Center believes that

Defendant may have falsely disparaged the Center and/or Dr. Engelberg to induce the claimants to revoke the powers of attorney. Because Defendant has withheld from the Center its own files and the contact information for the claimants, the Center has been unable to ascertain the nature of the communications Defendant made to the claimants to induce them to sign the revocations.

37. Defendant's conduct is directly adverse to the Center and violates the Rules of the Professional Conduct, as adopted both by the Maryland Court of Appeals and the District of Columbia Court of Appeals. Defendant is a member of the Maryland Bar and, in signing pleadings in the *Franqui* Case before this Court, is also subject to the Rules of Professional Conduct of the District of Columbia.

38. Dr. Engelberg learned of Defendant's conduct in a letter from Defendant on December 17, 2008, as he was about to retain local counsel to ensure satisfaction of the preconditions for payment of the wrongful death claims. Defendant's letter demanded that Dr. Engelberg have no further communication with the *Franqui* plaintiffs, notwithstanding the Center's obligation to support them in recovering on their claims. Defendant's letter specifically acknowledged the role of the Center in the Case and assured the Center that "[t]he Estate Representatives acknowledge the role of the American Center in this case and will honor their commitment, *provided the Center does the same*" (emphasis added). Defendant thus attempted to link the honoring of the Center's agreement by the *Franqui* plaintiffs, whom he had attempted to cut off from communicating with Dr. Engelberg and the Center, to acquiescence by the Center in a non-existent agreement with Defendant to make significant additional payments for his legal services.

39. The Center's concern about Defendant's actions was compounded by his signing his December 17, 2008 letter to Dr. Engelberg and the Center as "Joshua 'McDermott' Ambush." Defendant's legal name is now Joshua M. Ambush. In or about late 2000, he changed his name from Maxwell Ambush. His insertion of "McDermott" as his middle name in the signature block was a clear reference to John J. McDermott, an attorney who had previously represented terrorism victims in litigation funded by the Center. At that time, McDermott had attempted to circumvent his agreement with the Center to increase his share of recoveries in an unrelated case. The Center had engaged Defendant in early 2003 to assist it (and Dr. Engelberg personally) in preparing a Bar complaint against Mr. McDermott. The gravamen of that complaint, in addition to concerns about the quality of Mr. McDermott's representation, was Mr. McDermott's attempts to overstate his role in certain representations in order to claim a portion of the Center's recovery. The Center did not ultimately submit the complaint to Bar Counsel, but Defendant was familiar with the Center's concerns due to his role in preparing the draft complaint. Defendant also represented the Center in 2007 in a motion to intervene filed under seal in this Court in the case *Steen, et al., v. Islamic Republic of Iran, et al.*, Civ. No. 00-3037 (CKK), in which the Center sought to protect its right to receive funds pursuant to a Claimant Agreement with the plaintiff, Mr. Steen, after Mr. McDermott orchestrated Mr. Steen's revocation of Dr. Engelberg's power of attorney. In the motion to intervene filed by Defendant, he argued that Mr. McDermott had a conflict of interest because he was hired by the Center to file and bring the Steen case to trial and then sought to interfere with the Center's relationship with Mr. Steen. Defendant has borrowed a page from

Mr. McDermott's playbook in his current efforts to secure a share of the recovery in the *Franqui* case. Defendant's use of the name "McDermott" in reference to himself in his December 17, 2008, can only be understood as his acknowledgment, albeit through an attempt at humor, that he was engaging in the same tactics used by Mr. McDermott.

40. Defendant has entered into agreements with all five of the *Franqui* case estate representatives and four out of the five *Franqui* case personal injury claimants for a percentage share of their recovery in excess of the 20% of their recovery that is payable to the Center. Absent Defendant's orchestration of the revocations of the powers of attorney, that work would be performed at no additional charge to the claimants under the Claimant Agreements. In addition, in persuading the claimants to revoke the powers of attorneys and stop cooperating with the Center, Defendant has exposed the *Franqui* claimants to a claim by the Center for reimbursement of its litigation expenses under the Claimant Agreements.

41. One personal injury claimant refused to revoke the power of attorney and refused Defendant's demand for an additional share of his recovery. That claimant has written to the Center to express his unhappiness that Defendant's conduct creates a "legal comedy of errors."

42. To fulfill its duty to protect the *Franqui* claimants and preserve their ability to receive payment from the Fund, on January 12, 2009, the Center wrote a letter to the claimants confirming the revocation of Dr. Engelberg's power of attorney and detailing the numerous and document-intensive actions that must be taken by their counsel, Defendant, in order to obtain payment from the State Department.

Dr. Engelberg offered to renew the Center's efforts to retain local counsel in Puerto Rico, where many of the documents were located, should the claimants or Defendant determine that such assistance would be helpful. Notwithstanding Defendant's improper conduct towards the Center, in the interest of the *Franqui* claimants, the Center reiterated its continuing commitment to support Defendant in processing the claims. The Center had this letter translated into Spanish so that the claimants would be certain to understand its terms. Unfortunately, the letters addressed to some of the claimants were returned unopened.

43. At all times, Dr. Engelberg has acted properly as attorney-in-fact for the *Franqui* claimants. The Center has fulfilled its obligations in the Claimant Agreement, has funded the expenses of this ongoing litigation and has diligently sought to keep the claimants informed. The Center relied upon Defendant as its agent to handle such communications and to act in good faith, as a fiduciary, in doing so. Defendant has never identified any manner in which either the Center's conduct under the Claimant Agreement or Dr. Engelberg's conduct as attorney-in-fact was inappropriate, improper or not in the best interest of the *Franqui* claimants. Defendant's actions in revoking the power of attorney, however, were not motivated by the best interests of the *Franqui* claimants.

44. Coincident with the revocation of Dr. Engelberg's power of attorney, Defendant demanded from the Center an amount in excess of $2 million in connection with the wrongful death claims, all in addition to the hourly compensation that he has received regularly since the Center hired him to work on the *Franqui* Case in 2001. Defendant has contended to the Center that he is entitled to these payments as a contingent fee

for his work.  No such agreement ever existed, and Defendant has no entitlement to this, or any, additional compensation.

45. The hourly rate that the Center has paid Defendant for his work on the *Franqui* Case is the rate Defendant has received in cases he handles for other clients.  In none of the cases on which Defendant has worked on for the Center has Defendant requested, nor has the Center agreed to pay, a contingent fee to Defendant.  Although other counsel have entered into agreements with Dr. Engelberg as attorney-in-fact with the approval of the Center to handle litigation on a discounted hourly basis in return for an additional contingent fee, in each and every one of those cases the amount of the contingency was clearly agreed to by the parties.  This is consistent with both D.C. Rule of Professional Conduct 1.5 and Maryland Rule of Professional Conduct 1.5, which require a contingent fee agreement to be in writing and to state the method by which the fee is to be determined, including the percentage accruing to the lawyer.

46. Defendant has also demanded that the settlement funds be deposited into his escrow account so that he could exercise complete control over their disbursement, allowing him to hold the Center's share hostage as leverage in his attempts to secure a larger fee for himself at the expense of the Center, which will be using its fee to continue its fight for other victims.  To preserve the status quo and prevent any misappropriation of the Center's funds or prejudice to its rights in the event that any of the *Franqui* wrongful death claims is paid out prior to the resolution of this dispute, the Center on January 29, 2009, placed Defendant on formal notice of the Center's interest in 20% of those proceeds and directed him not to disburse that 20% except as directed by the

Center. The Center further directed that the 80% to which each claimant is entitled should be properly and timely disbursed to that claimant upon receipt.

47. Since the inception of this action, Defendant has received $40,000,000 from the Fund for four of the five wrongful death claimants whose applications he filed. Defendant has paid $6.4 Million to the Center from those funds and has, per this Court's order, deposited $1.6 Million into the court registry. Defendant has stated that he will pay the Center $1.6 Million and deposit into the court registry an additional $400,000, once he receives the final $10 Million distribution from the Fund for the fifth wrongful death claimant. Defendant has refused to reveal how much of the claimants' 80% of the recovery will be paid to the claimants or whether the claimants have yet been paid any amount at all. Through counsel, Defendant has represented that Defendant has side agreements with the claimants under which he would retain a portion of the claimants' recovery. Defendant also asserts that he is entitled to the $2 Million in the court registry. The Center does not know whether Defendant has or will timely and adequately submit applications to the Fund on behalf of the four personal injury claimants from whom he obtained revocations of Dr. Engelberg's power of attorney.

48. On information and belief, Defendant has difficulty meeting his personal and business expenses and owes substantial amounts to creditors.

49. On at least two occasions, Defendant has disregarded the Center's instructions for how to disburse the funds the Center deposited in the escrow account maintained by Defendant. Defendant failed to pay an expert witness with funds deposited for that purpose. In addition, Defendant told the Center that he had not used the funds from

his escrow account that had been deposited there by the Center to pay Mr. Gaston but had used them for other purposes, in direct contradiction of the Center's instructions. The Center had to deposit new funds into the escrow account to cover its payment obligation to Mr. Gaston.

50. Based on Defendant's pattern of conduct, his willingness to act adversely to his former client the Center on a matter substantially related to his representation of the Center, his willingness to interfere with the Center's contractual agreements with the *Franqui* claimants, his past disregard of direct instructions regarding disbursements from his escrow accounts, and the large amount of money that will be forthcoming from the Fund, the Center is concerned that the Fund proceeds for the personal injury claimants may not be disbursed properly if deposited directly into Defendant's escrow account. On information and belief, Defendant intends to keep for himself a percentage portion of the claimant's 80% share of the recovery. In so doing, he disrupts for his own enrichment the expectation that the Center has created in the claimants through the Claimant Agreements that Defendant signed on behalf of the Center.

51. By reason of Defendant's improper conduct, the Center has suffered damages, both financially and in harm to its reputation, and has been required to engage counsel and incur fees and expenses that it would not have otherwise incurred.

## COUNT I – DECLARATORY RELIEF

52. Plaintiff incorporates by reference all of the allegations stated in paragraphs 1-51.

53. Defendant is not entitled to any contingent compensation from the Center for his work on the *Franqui* Case. Neither the Center nor Dr. Engelberg as attorney-in-fact

for the claimants has entered into a binding agreement to make any such payments. Defendant has no entitlement to compensation from the Center beyond the hourly rate he has been paid. The Center is responsible under the Claimant Agreements for securing counsel and obtaining recovery on behalf of the claimants, and Defendant's orchestration of the revocation of the ancillary powers of attorney stripped the Center of the means necessary to fulfill their obligations under the Claimant Agreements.

54. The Center is entitled to a declaration that Defendant is not entitled to a contingent fee, a percentage share, or any other payment by the Center in connection with the *Franqui* claimants other than for any unpaid hourly fees for work that Defendant undertook with the approval of the Center, nor is he entitled to control the disbursement of any recovered funds that have yet to be paid by the Fund to the personal injury claimants.

## COUNT II – BREACH OF FIDUCIARY DUTY

55. Plaintiff incorporates by reference all of the allegations stated in paragraphs 1-54.

56. Defendant, in his capacity as an agent of and attorney for the Center, had and continues to have a fiduciary duty to refrain from acting adversely to the Center, whether on his own or another's behalf, with respect to matters on which he represented the Center.

57. Defendant has knowingly, intentionally and repeatedly breached his fiduciary duty to the Center by acting in his own interest and against the Center's by (i) secretly causing nine of the *Franqui* claimants to revoke Dr. Engelberg's power of attorney; (ii) demanding to be paid a portion of the Center's percentage of the proceeds to which the Center is entitled under the Claimant Agreements negotiated by Defendant

on the Center's behalf, and (iii) requiring additional compensation from the claimants to complete their applications to the Fund. Defendant acted not out of concern for the claimants but in order to enrich himself. Defendant placed his desire for a share of the unexpected and large recovery ahead of his fiduciary duty to the Center and to the claimants.

58. Defendant's surreptitious action cut off direct communication between the Center and the *Franqui* claimants and hindered the Center in fulfilling its obligations to them. At the same time, Defendant ceased communicating with Dr. Engelberg and the Center on the substantive issues of the case. In addition, Defendant has repeatedly ignored requests by the Center and Dr. Engelberg to forward to the Center copies or originals of all agreements within Defendant's possession to which the Center is a party.

59. By severing the Center's relationship with the *Franqui* wrongful death claimants in his own interest, in direct contravention of reasonable instructions from the Center, Defendant cut off the Center from material information about the claims process and prevented the Center from ensuring that the victims' claims were filed properly and paid to the fullest extent possible. The Fund has disbursed funds to four out of the five wrongful death claimants, and Mr. Gaston, at the Center's direction, has filed an application to the Fund on behalf of one personal injury claimant. The Center is concerned that Defendant's sole control over the application process for the remaining five claimants may not be adequate.

60. Defendant's conduct has damaged the Center's reputation and jeopardized the Center's ability to secure funds to further its mission. If the proceeds from the Fund are not properly safeguarded and disbursed for the personal injury claimants, or if any

of the claimants are required to pay legal fees in excess of their promised 80% of the recovery, the Center will suffer damage to its reputation, and its ability to enter into similar agreements in the future will be significantly harmed.  Because Defendant, who was the Center's attorney and agent, has required the claimants to pay additional funds beyond the Center's 20% share to handle their applications to the Fund, Defendant has also placed the Center at risk of claims by the claimants that the Center was obligated to obtain a recovery for them in which the claimants would receive at least 80% of the proceeds.

61. Defendant's pursuit of his own interests at the expense of the Center, for whom he served as agent and attorney, constitutes a conflict of interest and breach of his fiduciary duty.

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT AND/OR BUSINESS EXPECTANCY

62. Plaintiff incorporates by reference all of the allegations stated in paragraphs 1-61.

63. The Claimant Agreements constitute a valid business relationship establishing the Center's right and obligation (i) to select the attorney to handle the litigation and related proceedings funded by the Center, (ii) to receive 20% of the proceeds of any settlement recovery by the *Franqui* claimants, and (iii) to ensure that the claimants receive 80% of the recovery.

64. Defendant had knowledge of the relationship or expectancy, given his personal role in negotiating the Claimant Agreements and the powers of attorney on behalf of the Center and Dr. Engelberg.  Defendant's intentional interference caused the *Franqui* claimants to revoke the power of attorney.  Defendant's demand for additional payment from the Center's 20% share threatens the Center's expectancy, and

Defendant's side agreements with the claimants damage the Center's reputation and place the Center at risk of suit.

65. Defendant's actions have already caused monetary and reputational damage to the Center that is likely to increase if Defendant maintains sole control of the payments from the Fund and if Defendant is permitted to take for himself a portion of the claimants' 80% of any recovery.

## RELIEF REQUESTED

Plaintiff respectfully requests that the Court enter an order:

1) declaring that Defendant is not entitled to a contingent fee, a percentage share, or any other payment by the Center in connection with the *Franqui* claimants other than for any unpaid hourly fees for work that Defendant undertook with the approval of the Center, nor is he entitled to control the disbursement of any recovered funds;

2) enjoining Defendant from further actions inconsistent with the Claimants Agreement, including enjoining Defendant from taking a portion of the claimants' 80% share of any recovery;

3) enjoining Defendant from receiving the Fund settlement monies on behalf of the personal injury *Franqui* claimants into an escrow account over which he has direct control, with such funds instead to go to an escrow account maintained Defendant's lead counsel or to such other account as the Court may direct (the "court-ordered escrow account");

4) in the alternative, if settlement proceeds from the Fund for the personal injury claimants have already been received by Defendant, ordering Defendant to transfer

100% of the settlement monies from his escrow account to the court-ordered escrow account;

5) ordering that such funds may be disbursed from the court-ordered escrow account only in accordance with the Claimant Agreements and that prior notice to and approval of the Court is required for distribution of the funds; and

6) awarding Plaintiff damages in an amount to be proved at trial, attorneys fees and costs, and such other relief as the Court deems just and proper.

Respectfully submitted,

Jack McKay
D.C. Bar No. 159335
Julia E. Judish
D.C. Bar No.  461630
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, DC  20037
(202) 663-8000
jack.mckay@pillsburylaw.com
julia.judish@pillsburylaw.com

*Counsel for Plaintiff American Center for Civil Justice*

25

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of May, 2009, the foregoing Amended

Complaint was served via electronic mail to the following counsel of record for

defendant Joshua M. Ambush:

> Aaron L. Handleman, Esq.
> Law Offices of Eccleston and Wolf, P.C.
> 2001 S Street, N.W.
> Suite 310
> Washington, D.C. 20009-1125
> handleman@ewdc.com

> _/s/ Julia E. Judish_____