**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **American Center for Civil Justice,** | **Civil No.: 09-233-PLF** |
| **Plaintiff and Counterclaim Defendant** | **Re:** |
| **v.** | **Declaratory Judgment** |
| **Joshua M. Ambush, Esq.,** | |
| **Defendant and Counterclaim Plaintiff** | |

## MOTION TO ENFORCE SETTLEMENT AGREEMENT

**TO THE HONORABLE COURT:**

**COMES NOW,** defendant and counterclaimant Joshua M. Ambush, Esq. ("Ambush"), through the undersigning counsel, and respectfully states, alleges and prays as follows:

### I.  Introduction

1.  This is a motion for the enforcement of the settlement agreement (the "Settlement Agreement") entered into by the parties with the purpose to settle their mutual claims in this case.  See Dkts. 133 and 134; and Exhibit 1, Settlement Agreement.

2.  According to the Settlement Agreement, the parties agreed that they would refrain from any litigation against the other arising out of, or related to the subject matter of this case, or to the services performed by each other in connection with the case of Vega-Franqui, et al., v. Syrian Arab Republic, et al., Civil No. 06-734 (RBW) (U.S.D.C. D.C. 2006) ("Vega-Franqui"), or to the administrative claims pursued before the U. S. Department of State and

related to the <u>Vega-Franqui</u> case.  <u>See</u> Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

3.   As detailed below, plaintiff and counterclaim defendant American Center for Civil Justice ("Plaintiff" or the "Center") knowingly, purposefully and actively opposed Ambush's efforts to collect his attorney fees earned for his legal services performed in connection to the <u>Vega-Franqui</u> case and the related administrative claims, in the case of <u>Domenech, et al., v. Guzmán, et al.</u>, Civil No. DAC 2010-3790 (503) before the Court of First Instance of Bayamón, Puerto Rico ("<u>Domenech v. Guzmán</u>").  Due to the opposition of the Center, the court denied Ambush's petition for intervention for the purpose of collecting his attorney fees.

4.   Michael Engelberg and Eliezer Perr, who are directors, principals or officers of the Center, are also parties to the Settlement Agreement.  The Center, Engelberg and Perr will be referred to as the "Settlement Plaintiffs."

5.   Furthermore, by and through attorney David Efron and with the publication of a defamatory and vitriolic video, the Settlement Plaintiffs had a hand in encouraging clients of Ambush to reject his representation of them and to contact and retain David Efron in his stead.

6.   In addition, by and through attorney David Efron, who has an attorney and client relationship with the Center, the Settlement Plaintiffs also instigated the case of <u>Rubén Vivas-Ruiz v. Ambush,</u> Civil No. 12-2046-JAF (U.S.D.C. P.R.), a few months after this Settlement Agreement was entered into.

7.   The Settlement Plaintiffs are thus in breach of the Settlement Agreement.  For

that, Ambush requests a declaratory relief and liquidated damages for each violation, as detailed below.

## II.  Jurisdiction

1.  On September 18, 2012, the parties to this case filed a "Consent Motion" in which they notified the Court that they had reached a Settlement Agreement and would dismiss the case upon the Court's distribution of the money deposited with the Court's registry according to the Settlement Agreement. See Dkt. 133.

2.  On that same date, this Honorable Court entered a "Consent Order" for the distribution of the money deposited with the registry of the Court according to the Settlement Agreement.  See Dkt. 134.

3.  On October 5, 2012, the parties filed a "Stipulation of Dismissal with Prejudice."  See Dkt. 137.

4.  This Honorable Court never issued a separate order and judgment dismissing the case as required by Fed. R. Civ. P. 58(a).

5.  Accordingly, this Honorable Court still has jurisdiction to order the enforcement of the Settlement Agreement.  See Bailey v. Potter, 478 F.3d 409, 412 (D.C. Cir. 2007) ("Although the district court stated on July 9, 2001, upon learning of the parties' settlement agreement, '[w]ith that, the case will be dismissed,' no separate order of dismissal was ever filed and entered on the docket. Because the district court did not issue the appropriate order pursuant to Rule 58(a) dismissing the complaint, it continued to have jurisdiction over Bailey's case.").  See also T Street Development, LLC, v.

<u>Dereje and Dereje</u>, 586 F.3d 6, 10-11 (D.C. Cir. 2009).

## III. Facts

### A.  Chronology of this Case

1.  This case arises from the dispute between Plaintiff and counter defendant, the American Center for Civil Justice (the "Center"),[1] Michael Engelberg and Eliezer Perr, on one side, and Defendant and counter claimant Ambush, on the other side, over fees that were due from the original set of plaintiffs in the case of <u>Vega-Franqui</u>.

2.  In <u>Vega-Franqui</u>, five estates were claiming damages for wrongful death, and five injured parties were also claiming for their injuries suffered as a result of a terrorist attack at the Lod Airport, in Israel, on May 30, 1972.  The <u>Vega-Franqui</u> case was filed by Ambush, acting as the legal representative for the five estates and the five injured parties, on April 21, 2006.  <u>See</u> <u>Vega-Franqui</u>, Dkt. 1.  One of those five estates was the Estate of Guzmán ("Estate of Guzmán), whose members inherited a claim for the wrongful death of Carmen Eneida Guzmán-Rosado (the "Victim") at the Lod Airport Massacre.

3.  While the <u>Vega-Franqui</u> case was being hotly litigated, Ambush was contacted by representatives of the U.S. Department of State in July 2008. The Department of State formally advised Ambush that an effort was underway to formalize a treaty between the United States and the

---

[1] Plaintiff used the name "The American Center for Civil Justice" without the designation of "Inc." at the end.  Plaintiff does not claim to be a corporation, just an "organization."  <u>See</u> Second Amended Complaint, Dkt. 25, ¶ 2.  There are different "Centers," and among them, more than one named "The American Center for Civil Justice," or for which "The American Center for Civil Justice" is part of the name of the entity.  <u>See</u> Counterclaim for Damages and Declaratory Relief, Dkt. 27, ¶¶ 15, 16.  <u>See also</u> <u>In re Engelberg</u>, Misc. No. 11-mc-00148-JG-JO (E.D.N.Y., 2011).  Plaintiff has never clarified this issue.

government of Libya.   The goal of the treaty was for Libya to renounce terrorism and in exchange it would be removed from the list of states that are sponsors of terrorism.   Ambush was told that, as a prerequisite of the treaty, Libya would have to settle all outstanding lawsuits against it at the time of the execution of the treaty, including the <u>Vega-Franqui</u> case.  The Department of State advised Ambush that the <u>Vega-Franqui</u> claimants would only be eligible for compensation under the treaty if their claim was still pending before the court on the date of the execution of the treaty.   Therefore, Ambush had to continue litigating the case to keep it alive until the execution of the treaty. His legal services were very valuable and significant for all the <u>Vega-Franqui</u> plaintiffs.

4.   On August 14, 2008, the governments of Libya and the United States of America executed a settlement agreement promising to settle the claims of both states' nationals against each state if Libya established a fund for the compensation of the victims (the "Fund").   Once the Fund was established, victims of Libyan terrorism who had pending lawsuits against Libya, including victims of the Lod Airport Massacre, would be eligible for compensation from the Fund, which would be administered by the Department of State.

5.   Ambush was in direct and frequent contact with the Department of State throughout 2008 on behalf of his clients, including the members of the Estate of Guzmán, to advocate for his clients and make sure they were included in the Libyan Settlement while simultaneously litigating the <u>Vega-Franqui</u> case.

6.   On October 31, 2008, then Secretary of State Condoleezza Rice certified that

the United States had received the settlement funds from Libya.

7.    On November 26, 2008, Ambush received correspondence from the Department of State notifying him of its procedures to apply for compensation for wrongful death claims covered under the August 14, 2008, treaty between the United States and Libya.

8.    Ambush forwarded the Department of State's letter to his clients.  At that time no representative of the Estate of Guzmán had been appointed.  Accordingly, the Department of State required strict proof of the legal authority of the Estate's representative.

9.    However, by December 2008, Ambush and the Center, Engelberg and Perr were embroiled in a dispute as to the management and control of the pending claims before the Department of State and Ambush's compensation.  The Center, Engelberg and Perr contended that they controlled every aspect of the pending claims and could make decisions for the claimants without even consulting them.  Ambush contended that he had a duty and obligation to the claimants and had an attorney client relationship with them.

10.   On December 16, 2008, Ambush met with members of the Estate of Guzmán in Puerto Rico.  Prior to meeting them, Ambush obtained legal advice from attorneys associated with the Maryland State Bar Association's Attorney Ethics Committee and from private counsel familiar with both the laws and rules of Maryland and Puerto Rico and obtained confirmation that the Rules of Ethics governing attorney conduct did not prohibit him from seeking a retainer agreement and fee arrangement with his clients at that stage of the litigation.

At that meeting, Lourdes Domenech-Guzmán, niece of the Victim, freely and knowingly executed a retainer and fee agreement with Ambush that indicated her mother's heirs would pay him 10% in attorney fees of whatever was collected for their claims ("Ambush Retainer").   On that same day, Carlos Guzmán-Rosado, a brother of the Victim, freely and knowingly executed the Ambush Retainer.   This 10% was independent and in addition to the 20% specified as pledge to the Center in its contingency agreement with some members of the Estate of Guzmán (the "Claimant and Center Agreement").

11.   On February 6, 2009, the Center filed the present action to gain control and management of all the pending claims before the Department of State at the time and out of Ambush's hands, and also as to Ambush's compensation.

12.   At an initial hearing on this case, this Court indicated that the Center's argument that Ambush had a duty to it in addition to his clients was shocking. <u>See</u> Exhibit 2, Transcript of April 21, 2009, hearing, p. 31, lines 6-8.   The Court also stated that the Center had no standing to complain in the name of the <u>Vega-Franqui</u> plaintiffs, and that the claimants were free to agree to pay Ambush additional compensation "voluntarily, which we'll never know unless somebody brings them [the <u>Vega-Franqui</u> plaintiffs] into this lawsuit either as witnesses or as parties." <u>See</u> Exhibit 2, Transcript of April 21, 2009, hearing, p. 38, lines 17-25, p. 39, lines 1-2.

13.   After indicating that the Center's case was weak and likely would be dismissed for failure to state a claim, the Court allowed the Center to amend its complaint for a third time.   <u>See</u> Exhibit 2, Transcript of April 21, 2009,

hearing, p. 45.  The Second Amended Complaint, Dkt. 25, survived because the Center added a claim for defamation.

14.    Thereafter, the Center engaged in vexatious litigation practices that were designed to make Ambush spend funds litigating and had nothing to do with getting to a practical resolution or to the truth, as the Court had wished.

15.    The Center filed a Motion to Recuse the Magistrate a week after telling the Court that it had no objection to the Magistrate.  <u>See</u> Dkt. 45.  This motion was denied.  <u>See</u> Dkts. 61 and 62.

16.    The Center also filed a Motion to Stay or Remove the Case to U.S. District Court for the District of Puerto Rico.  <u>See</u> Dkts. 95 and 96.  This motion was also denied.  <u>See</u> Dkt. 106.

17.    The Court set a Scheduling Order as stipulated to by both parties.  <u>See</u> Dkt. 33.  Discovery would take place in two phases.  Initially, only written discovery was allowed.

18.    The Honorable Magistrate Judge unequivocally told the Center that if it wanted answers to its questions it would have to issue written discovery requests and submit them to the <u>Vega-Franqui</u> plaintiff's attorney, Ambush.  <u>See</u> Order of January 15, 2010;[2] and Transcript of Hearing of January 12,

---

[2] The order, as entered on the Docket, reads:

ORDER by Magistrate Judge Deborah A. Robinson on 1/15/10: For the reasons set forth on the record on January 11, 2010: (1) Defendants Motion for Protective Order (Document No. 53) is denied as moot; and (2) Plaintiffs Motion to Compel Disclosure and Discovery Responses (Document No. 47) is granted in part. With regard to the requested contact information [,] it is ordered that Defendant, who represents the nine individuals whose contact information is addressed in the motion, shall accept service of any subpoena by Plaintiff. (See Scheduling and Case Management Order, paragraph 1). All subpoenas pursuant to this order shall be served by no later than January 15, 2010, and the documents so subpoenaed shall be returned by no later than February 5, 2010. With respect to the fee agreements [,] Defendant shall serve the

2010, p. 42, lines 19-25 and p. 43, lines 1-9.  Ambush would then have to travel to Puerto Rico to present the interrogatories to his clients and obtain their answers to those questions.  <u>See</u> note 1, *supra*, Order of January 15, 2010.

19.   However, the Center was barred by the Scheduling Order from contacting the <u>Vega-Franqui</u> plaintiffs directly or from interrogating them without the presence of their counsel Ambush.  The Scheduling Order only provided for service of subpoenas and written discovery on the <u>Vega-Franqui</u> plaintiffs. <u>See</u> Dkt. 33 and Transcript of Hearing of January 12, 2010, pp. 30-43.

20.   To circumvent the Scheduling Order restriction on direct communications with the <u>Vega-Franqui</u> plaintiffs, and in a blatant effort to sabotage the entire course of conduct and payment process agreed to by the parties of this case and ordered by the court, the Center, Engelberg and Perr placed a provocative and defamatory full page advertisement in the major paper in Puerto Rico through Javier López-Pérez, Esq.  The Center admitted that it placed the advertisement.  <u>See</u> Dkt. 77, p. 4 ("Indeed, the only action taken by the Center to initiate contact with the Franqui Claimants was the placement of a notice in a Puerto Rican newspaper notifying the Claimants of the fact that the fee agreement foisted upon them by Ambush was improper and suggesting they contact counsel.").  This advertisement succeeded in catching the attention of the <u>Vega-Franqui</u> plaintiffs.  The Center placed the advertisement at the precise moment that it knew Ambush was on his way to

---

unredacted acknowledgments by no later than January 15, 2010. In all other respects, Plaintiffs Motion to Compel is denied as moot. (lcdar3) (Entered: 01/15/2010).

Puerto Rico to serve the subpoenas and to meet with his clients to obtain written responses to the Center's written discovery questions, as directed by the Court.  <u>See</u> Dkt. 71.

21.     Not only was this blatant tortious interference with contract and defamation, but it also turned this case on its head.  Some of the <u>Vega-Franqui</u> plaintiffs who saw the advertisement were unfazed and continued with Ambush as their attorney.  They answered the Center's written discovery requests that were delivered by Ambush as directed by the Court.  However, at least two families of the <u>Vega-Franqui</u> plaintiffs were provoked by the advertisement to contact Javier López-Perez, Esq.  Then, at the direction of the Center, Engelberg and Perr, they were given affidavits to sign for use in this case, that in effect stated that Ambush coerced them into signing retainers for an additional compensation, precisely the position that the Center was espousing.  <u>See</u> Dkt. 64-1.  They were also instructed by Javier López-Perez, Esq., and the Center not to meet Ambush and not to accept any document from him, including the written discovery requests demanded by the Center, which motivated Ambush's trip to Puerto Rico.  <u>See</u> Dkt. 71.  <u>See also</u> Dkt. 64-1 and Order of January 15, 2010, *supra*, at note 1.

22.     As a result of the Center's blatant disregard for this Court's orders, its campaign to suborn witnesses in this case and its tortious interference, a separate case instigated and sponsored by the Center, Engelberg and Perr, <u>Berganzo, et al., v Ambush</u>, Civil No. 10-1044 (GAG) (U.S.D.C. P.R.), was

filed in the U.S. District Court for the District of Puerto Rico.[3]

## B.  The Estate of Guzmán

1.  The Estate of Guzmán is the fifth estate mentioned throughout the hearing held before this Court on April 21, 2009, and in the documents filed in this case.

2.  Despite the interference of the Center, Engelberg and Perr, Ambush worked diligently to establish and prosecute the claim of the Estate of Guzmán before the Department of State.   With the cooperation of Lourdes Domenech-Guzmán, all the members of the Estate of Guzmán (at that time 38 individuals), with the advice and supervision of their independent counsel, signed powers of attorney documents authorizing Lourdes Domenech-Guzmán to act on behalf of the Estate for purpose of the claim before the Department of State.  The powers given to her were enumerated and limited, and expressly authorized her to ratify the engagement of Ambush as the lawyer for the Estate and to pay him 10% in attorney's fees plus expenses. Each and every heir, 38 in total at the time, confirmed the retainer agreement with Ambush through Powers of Attorney Deeds.  In addition, the late Tomás Guzmán, alive at the time, with the advice and supervision of his independent counsel, also executed a retainer and fee agreement with Ambush.

3.  As proof of his authority to act on behalf of the Guzman's, Ambush had a retainer from three sub-estate representatives.   Ambush also had an acknowledgment from each and every claimant member of the Estate of

---

[3] The jury issued a judgment for the plaintiffs and Ambush satisfied the judgment in full.

Guzmán, signed and notarized after being advised by their independent local counsel.

4.   Ambush located, acquired and compiled all of the documents required by the Department of State, including multiple court orders for Declarations of Heirs for each Guzmán sub-Estate, birth certificates, proof of citizenship, and birth and death records.

5.   By February 2010, Ambush had completed all of the work for the Guzmán Estate and had submitted it to the Department of State.

6.   Ambush also obtained a certification to the effect that he represented the Estate, and certified translations from Spanish to English of numerous documents to comply with the Department of State requirements.

7.   In addition, Ambush paid out of pocket expenses of over $43,960.00 to prepare the case and all the required documents.

8.   After Ambush satisfied all of the enumerated requirements of the Department of State, the Estate's claim was established.  The $10 million award from the Fund would have been granted at that point but for the demand of the Department of State that two heirs re-execute their power-of-attorneys to Lourdes Domenech-Guzmán, and for her to re-execute her release of Libya after the execution of those two powers-of-attorney by the heirs had been completed.

9.   On November 27, 2009, Lourdes Domenech-Guzmán, as the representative for the members of the Estate of Guzmán, confirmed in a sworn statement that the members of the Estate of Guzmán had retained Ambush as their

lawyer for the claims related to the wrongful death of the Victim, and that they had agreed to pay Ambush 10% in attorney fees, in addition to the 20% they had agreed to pay to the Center.  See Exhibit 3, Sworn Statement by Lourdes Domenech-Guzmán, November 27, 2009.

10. The 10% in fees agreed by Ambush and the members of the Estate of Guzmán amounts to $1 million.

11. During the pendency of this action, and before the Settlement Agreement, the other four estates were paid a total compensation of $40 million.  Ambush handled payments for the estates and made payments to the Center according to the agreements reached by the parties and the orders from this Court.  However, the fifth estate, the Estate of Guzmán had not been paid by the time the parties to this action, and also Engelberg and Perr, entered into the Settlement Agreement.  This delay of more than four years was largely due to interference by the Center, Engelberg and Perr with the relationship between Ambush and the members of the Estate of Guzmán.

12. As to the compensation remaining to be paid to the Estate of Guzmán and the payment to the Center, this Honorable Court ordered that it be handled in the same manner as the payments to the other four estates.  See Dkt. 22.

13. On August 5, 2009, this Honorable Court issued a Scheduling Order stating the procedure for discovery.  See Dkt. 33.

14. However, while it was clear that the Center could not contact the members of the Estate of Guzmán directly, but only through Ambush, the Center circumvented the Scheduling Order and communicated with them by running

an advertisement and procuring the publication of an article in a major newspaper in Puerto Rico.  <u>See</u> Dkt. 63-1, and the discussion above at paragraphs A.20 to A.21.

15. As a result of the Center's placing of the newspaper advertisement and the publication of the article, some members of the Estate of Guzmán, including Lourdes Domenech-Guzmán, contacted the lawyer hired by the Center, Javier López-Pérez, Esq.  <u>See</u> Dkt. 64-1.

16. Upon information and belief, approximately by January 2010, Lourdes Domenech-Guzmán met with Javier López-Pérez, Engelberg, Perr and Neal Sher.

17. Javier López-Pérez, acting as an agent for the Center, convinced some of the members of the Estate of Guzmán, including Lourdes Domenech-Guzmán, to terminate Ambush as their attorney and hire him instead.  The Center also hired Neal M. Sher[4] to represent those members of the Estate of Guzmán. The Center later hired and added to the representation David Efrón, Esq., who hired José A. Cuevas-Segarra, Esq.  At the time, the claim by the Estate of Guzman, which was virtually complete after being prepared and prosecuted by Ambush, was still pending before the Department of State.

18. The lawyers hired by the Center appeared before the Department of State claiming to represent all the members of the Estate of Guzmán, even though some other members of the Estate wanted Ambush to continue representing

---

[4] Neal M. Sher had been disbarred by the D.C. Court of Appeals on August 28, 2003.  <u>See</u> <u>In re Sher</u>, 830 A.2d 1262 (D.C. 2003).  Following his disbarment in D.C., he was reciprocally disciplined with a one year suspension in New York.  <u>See</u> <u>In re Sher</u>, 15 A.D.3d 123 (N.Y. App. Div. 2005).

them.   This put into question the authority of Ambush to represent the members of the Estate and also Lourdes' authority as their representative.

19.   Also, the Center, Engelberg and Perr, through Neal Sher, instigated a bar complaint against Ambush for Lourdes Domenech-Guzmán, falsely claiming that he refused to turn the Estate's documents over to him.   Bar counsel closed the case without taking any action.   Lourdes Domenech-Guzmán also filed a false criminal complaint against Ambush alleging that he stalked her. An interim restraining order barred Ambush from contacting his clients, all of the members of the Estate of Guzmán.   When the complaint was finally dismissed, the damage was already done.   The Center, Engelberg and Perr moved into the vacuum created by their own actions of instigating a fatal conflict of interest for Ambush that compelled him to withdraw from representing his clients, and proceeded with their campaign of placing Ambush in disrepute.

20.   On October 6, 2010, the Department of State notified the members of the Estate of Guzmán, through Ambush, that, due to the conflicts as to the legal representation of the Estate and the doubts about the authority of Lourdes Domenech-Guzmán, the Department would now require an order from a court for the appointment of a representative for the Estate.   In effect, as a direct result of the Center's interference, all of Ambush's work to establish a representative for the Estate by operation of Powers of Attorney was wiped out and the Guzmán Estate's claim incurred additional delay and expense that it would otherwise not have had.

21. On October 14, 2010, Ambush advised the members of the Estate of Guzmán in writing that he would not be able to continue as their legal representative due to conflicts of interest among the members of the Estate, including Lourdes Domenech-Guzmán's objection to his representation.  Ambush did not abandon his clients but was compelled by the legal ethics rules to resign once the dispute arose.  He also advised them of the new requirement by the Department of State.

22. Once Ambush resigned from representing the Estate, the Guzmán family members fought among themselves.  Some family members acquiesced to the representation of David Efron and José A. Cuevas-Segarra, as orchestrated by the Center, and certain others did not.  As a result, the Department of State's demand for a court order establishing an Estate Representative evolved into contested litigation, known as <u>Domenech v. Guzmán</u>.  <u>See</u> Exhibit 4, Translation of Complaint in <u>Domenech v. Guzmán</u>.[5]

23. This controversy regarding the legal representation of the Estate of Guzmán delayed the proceedings before the Department of State until almost two years later, when the Court of First Instance of Puerto Rico issued an order in the case of <u>Domenech v. Guzmán</u> granting Lourdes Domenech-Guzmán limited authority to act as administrator of the Estate.  This was for the limited purpose of signing the documents necessary to move the $10 million in compensation from the Fund into that court's registry.  Once the funds were

---

[5] Some of the exhibits are translations from documents originally in the Spanish language.  The translations were prepared by Targem Translations, others were prepared by Targem and revised by Nayda I. Pérez-Román, and others were translated by Nayda I. Pérez-Román.  See Exhibit 22, Declaration of Nayda I. Pérez-Román.

deposited with the court her power ceased.  She never had power to hire other attorneys different from Ambush for the entire Estate.  She never had power to give Engelberg a power of attorney for the entire Estate.   In fact, the defendants in the case of Domenech v. Guzmán specifically revoked the powers of attorney that they had granted to Lourdes Domenech-Guzmán.  See Exhibit 5 Deeds of Revocation of Power of Attorney.  Therefore, neither Lourdes Domenech-Guzmán, Engelberg, Perr, the Center or Efrón, had any power to act once the funds were deposited with the court.  Yet, because none of the parties objected, and because the Center controlled the acts of Lourdes Domenech-Guzmán, Efron and Cuevas-Segarra, attorneys Efron and Cuevas-Segarra continued to make claims on behalf of the Estate as if they had the authority to do so.

24.     On March 20, 2012, the Department of State deposited the $10 million compensation from the Fund with the court in the case of Domenech v. Guzmán.

25.     On March 26, 2012, after the Department of State deposited the $10 million with the court, the plaintiffs in the case of Domenech v. Guzmán filed a "Motion Requesting Remediation."   See Exhibit 6, Translation of Motion Requesting Remediation.  In this motion, the lawyers hired by the Center to represent the plaintiffs, requested the court to distribute the compensation deposited with the court.  However, the lawyers hired by the Center also requested the court to disburse 20% of the funds to the Center.  Paragraph 13 of the motion claims the following:

> In addition to the distribution expressed herein based on share by line and per stirpe, the suit in this case requests that 20% of the amount, or two million dollars ($2,000,000.00) be granted as attorney's fees.  This takes into consideration that the "American Center for Civil Justice," has contracts signed by parties who are beneficiaries to the consigned fund.  Said entity, in the last seven (7) years, has dedicated itself in this case to lobbying and negotiating with the United States Government, and to litigating against the Libyan Government in Washington for the claims of Puerto Rican victims present at the Lod airport, Israel, to be included in the compensations which the Libyan republic paid.   Said organization initially committed itself  - via the government of Israel – to the task of identifying Puerto-Rican victims and/or their heirs, locating them on the island, and covering all costs of the claims, such as attorney's fees, for claims filed in Washington as well as in Puerto Rico.  It is based on those negotiations that the agreed-upon **payment is requested in the name of the American Center for Civil Justice**, Lcdo. David Efron and Lcdo. José A. Cuevas Segarra, jointly.

Exhibit 6, Translation of Motion Requesting Remediation, ¶ 13 (emphasis added).

26.   Ambush asserts that the statements quoted above regarding the Center are patently false.  In addition, as can be seen from the language quoted above, in addition to representing the plaintiffs in the case of <u>Domenech v. Guzmán</u>, the lawyers hired by the Center were also making a claim for the Center and for attorneys Efron and Cuevas-Segarra to get paid.  The assertions made on behalf of the Center by Efron and Cuevas-Segarra are consistent with the Center's other admitted motives of protecting its reputation and ensuring that it is not sued by the claimants.  <u>See</u> Exhibit 2, Transcript of April 21, 2009, hearing, p. 8, lines 12-16; p. 26, line 8; p. 36, line 19; and p. 37, line 5.

27.   However, the complaint and other filings by the parties fail to mention the 10% in attorney fees that the members of the Estate of Guzmán agreed to pay Ambush for his legal services as the attorney of all the members of the

Estate for close to a decade, from 2001 to 2010.  By the time Ambush withdrew as the attorney for the Estate of Guzmán due to conflicts of interest created by the Center, all the substantive work and documents required by the Department of State had already been obtained by Ambush and filed by him with the Department.

28.   Counsel for Ambush wrote to counsel for the plaintiffs and the defendants in the case of <u>Domenech v. Guzmán</u> demanding that Ambush's 10% fee be recognized and paid, and that the record of the case be corrected to reflect the undisputed fact that Ambush represented the Estate of Guzmán and the individual Guzmán family members both during the <u>Vega Franqui</u> case and before the Department of State.

29.   On August 6, 2012, the Center filed a petition for intervention in the case of <u>Domenech v. Guzmán</u>.  <u>See</u> Exhibit 7, Translation of Center's Petition for Intervention in <u>Domenech v. Guzmán</u>.

30.   With the consent of the plaintiffs and the defendants, on August 31, 2012, the Court of First Instance of Puerto Rico granted the Center's petition for intervention, making it a party to the case of <u>Domenech v. Guzmán</u>.  <u>See</u> Exhibits 8 and 9, Translation of Minutes of August 31, 2012, and Translation of Partial Judgment of August 31, 2012 in the case of <u>Domenech v. Guzmán</u>.

31.   In a stipulation entered into by the plaintiffs, the defendants and the Center, they agreed to distribute to the plaintiffs and the defendants 80% of the deposited funds.  <u>See</u> Exhibit 10, Translation of Joint Motion Submitting Stipulation and Request for Partial Judgment in case of <u>Domenech v.</u>

<u>Guzmán</u>.  The parties and the Center didn't even mention Ambush's claim for attorney fees.  <u>See</u> <u>Id</u>.  By order of August 31, 2012, the court granted the request for the distribution of 80% of the deposited funds.  <u>See</u> Exhibits 8 and 9, Translation of Minutes of August 31, 2012, and Translation of Partial Judgment of August 31, 2012 in the case of <u>Domenech v. Guzmán</u>.  The parties agreed that the remaining 20% would be subject to the competing claims by the defendants, the Center and counsel for plaintiffs.  <u>See</u> Exhibits8, 9 and 10.

32.     Even when they were fully aware of Ambush's claim for 10% in attorney fees, no one informed the court about it.  And even knowing of Ambush's claim for 10% in attorney fees, the parties and the Center only requested the court to retain 20%, instead of 30%, and distribute the other 80%.

33.     The actions of the Center were designed to deliberately exclude Ambush completely and make sure that the Center was paid a full 20%, despite not fulfilling its obligations under the Claimant and Center Agreement.

34.     The main obligation of the Center under the Claimant and Center Agreement was to pay for the expenses of the case and the attorney fees.  <u>See</u> Exhibit 7, p. 13-16.  However, the $43,960.00 in expenses for the case were paid by Ambush, and the Center did not pay Ambush's attorney fees as agreed to do under the Claimant and Center Agreement.  Therefore, the Center is in substantial breach of that agreement.

**C.  Settlement Agreement**

1.     Less than two weeks after the court in Puerto Rico granted the Center's

petition for intervention and approved the joint stipulation by the parties on August 31, 2012, approximately by September 12, 2012, the Center, Engelberg and Perr agreed to settle this case and entered into the Settlement Agreement with Ambush.  <u>See</u> Exhibit 1, Settlement Agreement.  <u>See also</u> Dkts. 132, 133 and 134.

2.  Paragraph 6 of the Settlement Agreement states:

> Neither Ambush, on the one hand, or **the Center, Dr. Engelberg, or Perr**, on the other hand, **nor any person or entity acting with their knowledge or under their direction or control**, **shall encourage, sponsor, initiate, or finance**, including, but not limited to, the payment of attorneys' fees or costs, **any form of claim or litigation against the other arising out of or related to the subject matter of the Litigation [ACCJ v. Ambush] or the *Franqui* Litigation [Vega-Franqui v. Syria] or the services performed by any of the Parties in connection with the *Franqui* Litigation or the administrative claims of any of the plaintiffs in the *Franqui* Litigation** after that Litigation was dismissed.  **In the event of any breach of this provision, the non-breaching Party shall be entitled to recover from the breaching Party liquidated damages in the amount of $600,000, plus reasonable attorneys' fees and expenses** incurred in enforcing the remedy provided for under this Paragraph 6.  Any action to enforce the remedy provided under this Paragraph 6 shall be filed in the United States District Court of the District of Columbia (the "Court") and shall include the request that the case be assigned to the judge of that Court who presided over the Litigation.  The Parties consent to the exercise of jurisdiction over them by the Court in any such proceeding filed to enforce the remedy provided under this Paragraph 6.

Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

## D.  Ambush's Motion to Intervene in the Case of <u>Domenech v. Guzmán</u>

1.  Even though Ambush had made his claim of attorney fees directly to his clients, the plaintiffs and the defendants in the case of <u>Domenech v. Guzmán</u>, who were the claimants in the administrative proceeding before the Department of State, none of them made any attempt to pay him and they

didn't even notify the court of his claim.  The Center did not notify the court of Ambush's claim either nor did it pay for Ambush's attorney fees, as it agreed in the Claimant and Center Agreement.  All of them were trying to avoid Ambush's collection attempts.  Ambush did not want to sue his former clients.  However, since no party to the case recognized Ambush's claim for attorney fees and did not even inform the court of his pending claim, Ambush filed a petition for intervention in that case on April 26, 2013 ("Ambush's Intervention").  <u>See</u> Exhibit 11, Translation of Ambush's Petition for Intervention filed on April 26, 2013, in case of <u>Domenech v. Guzmán</u>.[6]

2.   On May 16, 2013, the judge ordered the parties to state their positions as to Ambush's Intervention.  <u>See</u> Exhibit 12, Translation of Order of May 16, 2013, in case of <u>Domenech v. Guzmán</u>.

3.   On June 18, 2013, the Center filed a "Motion in Compliance With Order," in which it <u>expressly opposed Ambush's Intervention</u> ("Center's Opposition to Intervention").  <u>See</u> Exhibit 13, Translation of Center's Opposition to Intervention.  In its Opposition, **the Center expressly states that Ambush is** **<u>not making any claims against the Center</u>**.  <u>See</u> Exhibit 12, p. 2, ¶ 5.  However, <u>the Center expressly opposed Ambush's Intervention and his</u>

---

[6]  Since the court had not ruled on Ambush's Intervention and the statute of limitations was running, Ambush filed an independent claim for collection of attorney fees against all the members of the Estate of Guzmán.  <u>See</u> <u>Ambush v. Domenech</u>, Civil No. D CD2013-2891 (501)(P.R. Court of First Instance, Bayamón).  Later, Ambush moved for consolidation of the cases of <u>Domenech v. Guzmán</u> and <u>Ambush v. Domenech</u>.  In an ironic twist of events for the plaintiffs in the case of <u>Domenech v. Guzmán</u>, the lawyers hired by the Center, David Efrón and José A. Cuevas-Segarra, continue to claim attorney fees for themselves in the case of <u>Domenech v. Guzmán</u>, but already stated that they will not represent any of the plaintiffs of that case in the case of <u>Ambush v. Domenech</u>.  In other words, they still represent plaintiffs for the limited purpose of collecting their attorney fees, but they won't represent them to defend them from Ambush's claims for his attorney fees.

<u>attempt to collect his attorney fees</u> for the work performed for the Estate of Guzmán in the <u>Vega-Franqui</u> case and in the administrative proceedings before the Department of State.  <u>See</u> Exhibit 13 p. 12, prayer for relief.

4.    On July 31, 2013, Ambush filed a reply to the Center's Opposition to Intervention.  <u>See</u> Exhibit 14, Translation of Ambush's Reply to the Center's Opposition to Intervention.

5.    Previously, on July 24, 2013, Ambush had filed a motion to disqualify the attorneys for plaintiffs in the case of <u>Domenech v. Guzmán</u>, Efron and Cuevas-Segarra, due to numerous conflicts of interests among the plaintiffs themselves, the plaintiffs and their lawyers, and among those same lawyers and the Center, who was supposed to pay the attorney fees for the plaintiffs' lawyers.  Instead of filing an opposition to the motion to disqualify, on August 1, 2013, plaintiffs filed a motion to strike the motion to disqualify.  On August 20, 2013, Ambush filed an opposition to plaintiffs' motion to strike.

6.    Even though the controversy related to the disqualification of plaintiffs' lawyers was between Ambush, on one side, and the plaintiffs and their lawyers, on the other, on September 4, 2014, the Center, by its own initiative and without any order from the court, filed a document titled "Motion in Reply to Statements of Attorney Ambush in his 'Opposition to Motion to Strike.'" <u>See</u> Exhibit 15, Translation of Center's "Motion in Reply to Statements of Attorney Ambush in his 'Opposition to Motion to Strike.'"   In this reply, the Center argued that Ambush had no rights or claims over the money deposited in court.  <u>See</u> <u>Id.</u>  In the prayer for relief, the Center expressly requested the

court to "deny Ambush's intervention."  <u>See</u> <u>Id</u>, p. 5.

7. Since the court had not ruled yet on Ambush's Intervention, the Center's Opposition to Intervention, and Ambush's Reply to the Center's Opposition to Intervention, on February 28, 2014, the Center took the initiative again of filing another motion, the "Motion Requesting Adjudication and Remedies" ("Center's Motion for Adjudication"), requesting that the court hold in its favor. <u>See</u> Exhibit 16, Translation of Center's Motion for Adjudication.  As in the Center's Opposition to Intervention, in its Motion for Adjudication **the Center expressly states that Ambush is not making any claims against the Center**.  <u>See</u> Exhibit 16, p. 6, ¶ 11.d.  However, in this Motion the Center argues again that Ambush has no right to any of the money deposited with the Court.  <u>See</u> Exhibit 16

8. Among other things, the Center argued to the court in Puerto Rico that the court had already issued a judgment adjudicating part of the deposited money remaining in court to the Center.  <u>See</u> Exhibit 16, pp. 1-3.  To support its argument, it cited the Partial Judgment issued by the court.  <u>See</u> <u>Id</u>.  As this Honorable Court can confirm, the Partial Judgment does not order the adjudication of anything to the Center.  <u>See</u> Partial Judgment, Exhibit 9, p. 1; and Minutes, Exhibit 8, pp. 3-4.  What the court did was grant the Center's petition for intervention and grant defendants a term to file an opposition.  <u>See</u> <u>Id</u>.  In addition, the Partial Judgment was obtained by the agreement of the Center, the plaintiffs, the defendants and their corresponding lawyers, being fully aware of Ambush's claim for attorney fees and knowingly excluding him.

In the process, they purposely hid these facts from the court to procure and obtain the Partial Judgment.  This makes the Partial Judgment void for lack of indispensable party.   The Center did this immediately after executing the Settlement Agreement in this case, in which it agreed not to interfere with Ambush's attempts to collect his attorney fees from the Estate of Guzmán.

9.   When the parties to this case entered into the Settlement Agreement they both knew that each of them had claims against the Estate of Guzmán that would be pursued if and when the members of the Estate of Guzman got paid.  The potential for each party to the Settlement Agreement to be able to pursue their corresponding actions for collection of their fees from the members of the Estate of Guzmán was of vital importance and essential to the Settlement Agreement.

10.   The Department of State held the payment to the Estate of Guzmán because there were conflicting claims as to the authority of the Estate's representatives and as to who was the attorney for the Estate.  After Ambush originally represented the Estate, Neal M. Sher, David Efron and José A. Cuevas-Segarra, all hired by the Center, claimed to represent them.  The Department of State wrote to Ambush stating that payment would be withheld until a court order was obtained that indicated who was authorized to act on behalf of the Estate.  The Settlement Agreement was specifically drafted in a way to prevent each party from interfering with the collection efforts of the other.  See the discussion above at paragraph B.20.

11.   If the Center had abided by the Settlement Agreement, it would have notified

the court in <u>Domenech v Guzmán</u> that it did not oppose Ambush's Intervention or simply remained silent.  The amount due to Ambush by the members of the Estate of Guzmán was an issue to be litigated between Ambush, the plaintiffs and the defendants, and to be decided by the court. The Center had no standing or right to oppose Ambush's Intervention.  The fact is that the Center was prohibited by the Settlement Agreement to oppose Ambush's Intervention.  <u>See</u> Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6. However, it is obvious from its actions that the intent of the Center all along was to interfere with Ambush's collection efforts.

12.     Furthermore, since the Center knew that Ambush had a claim for attorney fees of 10% and it had a claim for 20%, the Center should have brought that to the attention of the court.  The Center, jointly with the other parties, should have requested the court to set aside 30% of the deposited funds subject to the competing claims of the parties, including Ambush, to be determined later by the court.  Had the Center assumed this position, it would have been in compliance with the Settlement Agreement.

13.     Instead, the Center manipulated the information it had in order to increase the chances of getting 20% in fees from the Estate of Guzmán while making sure Ambush had no chance to get paid.

14.     On May 21, 2014, the court in the case of <u>Domenech v. Guzmán</u>, issued a resolution denying Ambush's Petition for Intervention and his motion for consolidation, based primarily on the arguments and objections of the Center. This resolution was notified on May 23, 2014.  Therefore, the Center's actions

effectively interfered with, and blocked Ambush's efforts to collect his attorney fees for the legal services he offered the Estate of Guzmán in relation to the Vega-Franqui case and the procedure before the Department of State. Nonetheless, Ambush will appeal the resolution.

**E.  The case of Vivas-Ruiz v. Ambush**

1.  In addition, a few months after the parties to this case entered into the Settlement Agreement, the Center, Engelberg and Perr instigated the filing of the case of Vivas-Ruiz v. Ambush, Civil No. 12-2046-JAF (U.S.D.C. P.R.).

2.  The plaintiff in that case, Rubén Vivas-Ruiz, was injured at the Lod Airport Massacre and is one of the original Vega-Franqui plaintiffs.

3.  As discussed above, in 2009 the Center hired a Puerto Rico attorney, Javier López-Pérez, Esq., to publish a notice in a newspaper to the Vega-Franqui plaintiffs, stating that they had been defrauded and urging them to contact him immediately.  Provoked by the López-Pérez's advertisement, certain of Ambush's clients met with attorneys hired by the Center along with representatives of the Center, and later filed a lawsuit against Ambush captioned Estate of Berganzo, et al., v. Ambush, Civil No. 10-1044-GAG–MEL (U.S.D.C. P.R.).  Although Noemí Rodrigez-Robles, Vivas-Ruiz's wife, was a plaintiff in that action, Vivas-Ruiz expressly stated that he was not part of the Berganzo claim, and remained a client of Ambush.  See Exhibit 17, Deposition of Noemí Rodríguez-Robles, February 1st, 2011, p. 9, lines 21-25.

4.  When López-Pérez withdrew his appearance from the Berganzo case, Engelberg admits that he found a new attorney, David Efron, for plaintiffs in

that matter.  <u>See</u> Exhibit 18, Deposition Excerpt of Michael Engelberg, p. 55, lines 3-8, and p. 57, lines 2-15.  The Center did this as a way of "protecting [its] role or protecting [its] interests."  <u>See</u> <u>id</u>, p. 56, lines 17-21.

5.   The Center also retained attorney David Efron.  The Center admits that it has an ongoing attorney and client relationship with David Efron.  <u>See</u> Exhibit 21, American Center for Civil Justice's Sworn Responses to Requests for Production of Documents, filed in <u>Berganzo v. Ambush</u>, Civil No. 10-1044-GAG–MEL (D.P.R.), p. 2 ("The Center has an existing attorney client relationship with attorneys Javier López-Pérez, Neal Sher and David Efron, and their respective law practices, employees and colleagues with respect to matters other than those related to the civil action styled as *The Estate of Angel Berganzo Colon v. Ambush*…").

6.   On or about September 24, 2010, once Efron was located and retained by the Center, it appears that all the Berganzo plaintiffs and Vivas-Ruiz met with Efron in his office, and signed a retainer to "engage[ ] the professional services of and give our authorization to the firm LAW OFFICES DAVID EFRON, PC ("EFRON") to represent us in a possible cause of action against Joshua Ambush, and any other party responsible for the monies that said individual improperly collected from us."  <u>See</u> Exhibit 19, Retainer Agreement of David Efron, September 24, 2010.

7.   However, Vivas-Ruiz later disclaimed any intent to sue Ambush.  In February 2011, Vivas-Ruiz attended Noemi Rodriguez-Robles' deposition in the <u>Berganzo</u> case.  Ambush allowed this on Efron's representation that Vivas-

Ruiz did not intend to bring a claim against Ambush. See Exhibit 17, Deposition of Noemí Rodríguez-Robles, February 1st, 2011, p. 9, lines 18-25, and p. 10, lines 1-5. Throughout all this, Vivas-Ruiz still retained Ambush as his attorney for the prosecution of his main claim and for a supplemental claim before the United States Department of Justice Foreign Claims Settlement Commission.

8.   Vivas-Ruiz prevailed in his main claim, but not on his supplemental claim. He collected his compensation and paid Ambush his attorney fees as agreed.

9.   Later on, Vivas-Ruiz filed a lawsuit against Ambush on December 26, 2012, after Ambush had completed all of the work on both of his claims before the Department of Justice. Vivas-Ruiz seeks repayment of all attorneys' fees he had paid to Ambush. He is not seeking the return of any money from the Center nor is the Center a defendant in that suit. Efron represents Vivas-Ruiz in that action.

**F. The Center's Continued Extra Judicial Conduct Encouraging Litigation Against Ambush by Victims of the Lod Airport Massacre**

1.   The Center, through Efron, is also attempting to interfere with Ambush's attorney and client relationship with the victims of the Lod Airport Massacre through similar defamatory advertising as the 2009 *El Nuevo Día* advertisement. On or about May 30, 2013, months after the settlement in this case, Efron appeared on an internet web "program," the "Insider Exclusive Investigative TV series" (hereinafter "Web Program") which is actually in

essence an attorney advertising infomercial.[7]  The subject of the web program

was "AIRPORT TERROR - The Lod Airport Massacre – Remembrance."

2.    The  text  of  the  website  advertising  the  Web  Program  explained  that  Efron

"represented several victims who were victimized twice - first, when they each

lost their respective fathers in the gruesome, terrorist act at Lod Airport and

second,  by  their  former  lawyer  whom  swindled  them  out  of  the  settlement

monies they should have received for the massacre of their fathers."    The

website  and  the  Web  Program  expressly  named  Ambush  as  that  lawyer.

Noemí Rodríguez-Robles, one of the plaintiffs in the <u>Berganzo</u> case instigated

by the Center and Vivas-Ruiz's wife, appeared in the Web Program alongside

plaintiff Efraín Berganzo and Efron.

3.    In the Web Program, Efron once again parroted the Center's allegations to

the effect that: (1) Ambush had already been paid by the Center for his legal

work;  (2)  any  attempt  to  collect  further  monies  from  the  <u>Vega-Franqui</u>

plaintiffs had been illegal; and (3) payment of legal fees to the Center was

legitimate.   The Center had repeatedly argued all three of these positions

before this Court, in the *El Nuevo Día* advertisement, in the <u>Domenech v.</u>

<u>Guzman</u> case, and in the <u>Berganzo</u> case.  Specifically, Efron stated:

> And [Ambush] persuaded them and by misleading them, by lying to them,
> and by withholding information […] to sign a contract where he would get
> an additional ten percent fee of everything he collected on ten million
> dollar estates for the death of each Puerto Rican and  U.S. Citizen.  We're
> talking a million dollars per estate, and he did this to a number of people in
> Puerto Rico.  He misled them by withholding information, by not telling
> them that even if they didn't sign that agreement, they would still get the

---

[7]   The  web  program  can  be  found  at  the  website  for  the  Law  Offices  of  David  Efron:
http://davidefronlaw.com/areas-of-expertise-law-firm-puerto-rico.asp .

money, by not telling them that the only thing left to do in the case was to voluntarily dismiss it because it was worthless, […] and by not telling them that he had already been paid by an organization [the American Center for Civil Justice] that the victims were already paying 20% for, including their legal fees.

Exhibit 20, Transcript of Web Program, p. 16, lines 12-21, p. 7, lines 1-11. .

4.  Notably, Efron misstated several things, including that Ambush had been fully paid by the Center, which was not found by the jury or the First Circuit in the <u>Berganzo</u> case.  The text of the website praised Efron's original legal victory over Ambush, expressly listed all of the victim-decedents of the Lod Airport Massacre, and then provided Efron's contact information.  <u>See</u> Exhibit 20, Transcript of Web Program, pp. 16-18.

5.  Like the 2009 advertisement in *El Nuevo Día*, there can be no doubt that the intent of Efron's appearance on the Web Program was to encourage further claims or litigation against Ambush  by other of the <u>Vega-Franqui</u> plaintiffs, with he as the attorney representing them.  Given Efron's ongoing attorney client relationship with the Center, the Center at least had to have known about the Web Program, if not authorized it outright, as they had previously done before.

**IV. Declaration of Material Breach of Settlement Agreement**

1.  "An agreement to settle a legal dispute is a contract.  Each party agrees to extinguish those legal rights it sought to enforce through litigation in exchange for those rights secured by the contract."  <u>Village of Kaktovik v. Watt</u>, 689 F.2d 222, 230 (D.C. Cir. 1982).

2.  "The enforceability of settlement agreements is governed by familiar

principles of contract law. […]  Upon breach by one party, the other party may obtain damages or specific performance as appropriate." *Id.*

3.   "To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009).

4.   "The District of Columbia applies the objective theory of contracts, meaning that 'the language of the agreement as it is written governs the obligations of the parties unless that language is unclear or there is fraud, duress, or mutual mistake.'" Kriesch v. Vilsack, 931 F. Supp. 2d 238, 253 (D.D.C. 2013).

5.   "A breach is material only if it relates to a matter of vital importance or if it goes to the essence [of the contract] and frustrates substantially the purpose for which the contract was agreed to by the injured party.  […]  When the facts are undisputed[,] the determination of whether there has been material non-compliance with the terms of a contract necessarily reduces to a question of law."  Kriesch v. Vilsack, 931 F. Supp. 2d at 253 (internal citations and quotation marks omitted).

6.   "In determining whether a material breach has occurred, the Court must consider: the extent to which [the] plaintiff[s] will be deprived of the benefit which [they] reasonably expected under the contract; the extent to which the plaintiff[s] can be adequately compensated for the part of that benefit of which [they] will be deprived; the extent to which the defendant will suffer forfeiture; the likelihood that the defendant will cure his failure, taking account of all the

circumstances including any reasonable assurances; and the extent to which the behavior of the defendant comports with standards of good faith and fair dealing." The Cuneo Law Grp., P.C. v. Joseph, 669 F. Supp. 2d 99, 109 (D.D.C. 2009) *aff'd sub nom.* Joseph v. Cuneo Law Grp., P.C., 428 F. App'x 6 (D.C. Cir. 2011).

7.  "A party's material breach of a settlement agreement generally excuses the other party's obligation to perform its end of the bargain under the agreement." The Cuneo Law Grp., P.C. v. Joseph, 669 F. Supp. 2d at 125.

8.  With the Settlement Agreement, the Center, Engelberg, Perr and Ambush agreed and entered into a contract, by which they would put an end to their mutual claims in this case. See Exhibit 1, Settlement Agreement. By the time the parties entered into the Agreement, the Center and its principals Engelberg and Perr, were fully aware of Ambush's 10% claim for attorney fees against the members of the Estate of Guzmán, and of all the proceedings in the case of Domenech v. Guzmán. They specifically referred to the Estate of Guzmán in these proceedings as the "fifth estate." However, they controlled, aided, abetted, directed, encouraged and manipulated plaintiffs, defendants, and their respective counsel, in the case of Domenech v. Guzmán, to hide from the court the claim being made by Ambush, with the purpose of excluding him from collecting.

9.  As soon as the court in Domenech v. Guzmán accepted the Center's petition for intervention in the case, the Center, Engelberg and Perr agreed to the Settlement Agreement in this case. This was a coordinated and deliberate

effort to exclude Ambush from the distribution of the funds that was being requested from the court in <u>Domenech v. Guzmán</u>, while maintaining the illusion of settling this case in good faith.

10. As part of the Settlement Agreement, the Center, Engelberg and Perr agreed not to "**encourage, sponsor, initiate, or finance** […] **any form of claim or litigation against [Ambush] arising out of or related to the subject matter of [this case] or [Vega-Franqui v. Syria] or the services performed by any of the Parties in connection with the *Franqui* Litigation or the administrative claims of any of the plaintiffs in the *Franqui* Litigation** after that Litigation was dismissed."  Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

11. In the case of <u>Domenech v. Guzmán</u>, the Center actively opposed Ambush's efforts to get paid for the legal services that Ambush offered to the members of the Estate of Guzmán in the case of <u>Vega-Franqui v. Syria</u>, and the subsequent administrative procedure at the Department of State.

12. In <u>Domenech v. Guzmán</u>, Ambush made a claim for his attorney fees for the legal services he provided.  Based mainly on the opposition by the Center and its arguments, the court denied Ambush's Petition for Intervention.  This constitutes a loss of $1 million in attorney fees to Ambush and a material breach of the Settlement Agreement by the Center, Engelberg and Perr.

13. Likewise, the Center and its principals Engelberg and Perr, were also fully aware of Ambush's representation of Vivas-Ruiz, and instigated him to file a complaint against Ambush.

14.   In the case of <u>Vivas-Ruiz v Ambush</u>, a former client of Ambush who had already been paid for his claim set forth in the <u>Vega-Franqui</u> case is seeking cancellation of his agreement with Ambush and a refund of the attorney fees he already paid to Ambush in the underlying <u>Vega-Franqui</u> case. The case was filed in December 2012, some months after the Settlement Agreement was executed between the parties.  The attorney representing Vivas-Ruiz is David Efron, who was originally hired by the Center to represent Vivas-Ruiz, his wife, Noemi Rodríguez-Robles, and some of the Guzmán claimants.  As stated by the Center, Efron has had an ongoing attorney and client relationship with the Center.   <u>See</u> Exhibit 21, American Center for Civil Justice's Sworn Responses to Requests for Production of Documents, filed in <u>Berganzo v. Ambush</u>, Civil No. 10-1044-GAG–MEL (D. P.R.), p. 2.

15.   Finally, the Center and its principals Engelberg and Perr, through their attorney and agent Efron, continue to interfere with Ambush's clients and collections of attorney fees with the publication of the Web Program.

16.   Instigating and encouraging litigation against Ambush by his former clients in the case of <u>Vega-Franqui, directly or through the Web Program,</u> constitutes a material breach of the Settlement Agreement by Plaintiff, the Center, and also by Engelberg and Perr.

17.   The amount of damages for the breach of the Settlement Agreement by the Center was already determined by the parties in Paragraph 6 as $600,000 for any breach.   <u>See</u> Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

18.   Accordingly, Ambush requests from the Honorable Court that it issue an order

declaring that the Plaintiff in this case, and also Engelberg and Perr, have incurred in three different instances of material breach of the Settlement Agreement, and Ambush is no longer limited and restricted by it.

## V. Payment of Liquidated Damages

1. "District of Columbia 'jurisprudence has been tolerant of liquidated damages clauses unless they are demonstrated unreasonable.' S. Brooke Purll, Inc., 850 A.2d at 1138. Thus, under District of Columbia law, contractual clauses providing for liquidated damages in the event of a contractual breach are unenforceable only when the remedy provided is deemed a penalty." The Cuneo Law Grp., P.C. v. Joseph, 669 F. Supp. 2d at 113-14.

2. "[So] long as a liquidated sum bears a reasonable relation to the damages foreseeable at the time of contracting the clause is enforceable." *Id* at 114.

3. "Further, if the liquidated damages clause was 'the product of fair arm's length bargaining, particularly between sophisticated parties, ... [greater] latitude [is] afforded the contracting parties to argue as they wish on the remedies for a breach.'" *Id.*

4. In the Settlement Agreement, Plaintiff and Ambush agreed that, **"[i]n the event of any breach of [paragraph 6], the non-breaching Party shall be entitled to recover from the breaching Party liquidated damages in the amount of $600,000, plus reasonable attorneys' fees and expenses** incurred in enforcing the remedy provided for under this Paragraph 6." Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

5. As stated above, Plaintiff, Engelberg and Perr breached the Settlement

Agreement by expressly and actively opposing in the case of <u>Domenech v. Guzmán</u>, Ambush's efforts to collect his attorney fees for the legal services he provided to the members of the Estate of Guzmán in the <u>Vega-Franqui</u> case and the proceedings before the Department of State.

6.   Plaintiff, Engelberg and Perr also breached the Settlement Agreement by instigating other claims against Ambush in the case of <u>Vivas-Ruiz v. Ambush</u>, as described above.

7.   Finally, Plaintiff, Engelberg and Perr breached the Settlement Agreement by instigating a encouraging former clients of Ambush to file claims against him for cancellation of his retainer agreement and recoupment of attorney fees.

8.   As agreed to by Ambush and the Center in the Settlement Agreement, Plaintiff, Engelberg and Perr are liable to Ambush for $600,000 in liquidated damages for each breach described above, plus reasonable attorney fees and expenses incurred in this process.  <u>See</u> Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

9.   The amount that Ambush will not be able to collect in attorney fees in the case of <u>Domenech v. Guzmán</u> due to the Center's material breach of the Settlement Agreement is $1 million, which is 67% more than the amount agreed by the parties as liquidated damages.   Ambush has also spent in attorney fees to make his claim in the case of <u>Domenech v. Guzmán</u> and defend from the filings by the Center.

10.   The potential loss in the case of Vivas-Ruiz, is $300,000 for legal fees plus $500,000 for other damages, for a total of $800,000.  The potential loss also

includes the attorney fees and expenses incurred for the defense of the case., which is still pending.

11.     Ambush estimates the damages caused by the Web Program at $1 million due to lost clients and the potential claims by former clients.  The loss to his reputation is incalculable.

12.     Accordingly, Ambush requests from the Honorable Court that it order Plaintiff, Engelberg and Perr to pay Ambush $600,000 in liquidated damages plus reasonable attorney fees and expenses for each of the material breaches of the Settlement Agreement, as described above, for a total of $1.8 million.

## VI. Attorney Fees

1.     In the Settlement Agreement, Ambush and the Center expressly agreed that, in case of **any** breach, the breaching party would be liable to the non-breaching party for "**reasonable attorneys' fees and expenses** incurred in enforcing the remedy provided" in Paragraph 6 of the Agreement.  Exhibit 1, Settlement Agreement, pp. 2-3, ¶ 6.

2.     Accordingly, Ambush respectfully requests from the Honorable Court that it order Plaintiff, Engelberg and Perr to pay Ambush the reasonable attorney fees and expenses incurred by him in enforcing the provisions of the Settlement Agreement.

## VII.     Conclusion

1.     With the purpose of ending all the litigation related to this case, the Center, Engelberg, Perr and Ambush entered into a Settlement Agreement. According to the Settlement Agreement, one party would not interfere with the

other party's attempts to collect the money they understood were each owed for their own services provided or performed in relation to the <u>Vega-Franqui</u> case and the proceedings before the Department of State.  The purpose and essence of the Settlement Agreement was for Ambush and the Center to pursue their own claims without any interference from the other party.

2. As stated in this Motion, the Center, Engelberg and Perr have materially breached their obligations and duties under the Settlement Agreement and, even though they expressly state and admit that Ambush is not making any claims against them, they are expressly and actively interfering with and opposing Ambush's attempts to collect his attorney fees.  They are also instigating additional litigation against Ambush for the cancellation of his retainer agreements with other clients from the original plaintiffs in the case of <u>Vega-Franqui v. Syria</u>.  Finally, the Center, Engelberg and Perr, through their agent and attorney Efron, are instigating and encouraging additional litigation against Ambush through the Web Program.

3. The Center, Engelberg and Perr have expressly, blatantly and materially breached the Settlement Agreement, its purpose and its intent, in three different instances.

4. Accordingly, this Honorable Court should declare the Center, Engelberg and Perr to be in material breach of the Settlement Agreement, release Ambush from its limitations and restrictions, and order the Center, Engelberg and Perr to pay Ambush $1.8 million as liquidated damages, plus reasonable attorneys' fees and expenses incurred for the enforcement of the Agreement.

**WHEREFORE**, Ambush respectfully requests that this Honorable Court grant the remedies requested here and order the following:

1. Declare Plaintiff, the Center, Engelberg and Perr in material breach of the Settlement Agreement and release Ambush from the limitations and restrictions imposed by it;

2. Order Plaintiff, the Center, Engelberg and Perr to pay Ambush $1.8 million in liquidated damages, as agreed to in the Settlement Agreement; and

3. Order Plaintiff, the Center, Engelberg and Perr to pay Ambush reasonable attorneys' fees and expenses incurred to enforce the provisions of the Settlement Agreement, as agreed.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, today June 12, 2014.

/s/ Ángel Sosa
Ángel Sosa
DC Bar No. 1,000,094
E-mail: asosa@tcmrslaw.com
**Toro, Colón, Mullet, Rivera & Sifre, P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will notify all parties registered through their attorneys of record. I also sent a copy by certified mail to Michael Engelberg, 75 Woodmere Blvd., Woodmere, NY 11598; and to Eliezer Perr, 1646 41st Street, Brooklyn, NY 11218.

In San Juan, Puerto Rico, today June 12, 2014.

s/ Ángel Sosa
Ángel Sosa
DC Bar No. 1,000,094
E-mail: asosa@tcmrslaw.com

**Toro, Colón, Mullet, Rivera & Sifre, P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

motion enforce settlement v17